## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **SUSAN V. MALDONADO,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07cv00070 |
| | ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner.

### I. Background and Standard of Review

Plaintiff, Susan V. Maldonado, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

-1-

mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th  Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'"  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Maldonado protectively filed her application for DIB on or about August 18, 2004, alleging disability as of April 30, 2003, due to degenerative disc disease, insomnia, depression and frozen left shoulder. (Record, ("R."), at 66-69, 93, 129, 134.) The claim was denied initially and upon  reconsideration.  (R. at 34-36, 39, 41-43.)  Maldonado then requested a hearing before an administrative law judge, ("ALJ"). (R. at 44.)   The ALJ held a hearing on January 24, 2006, at which Maldonado was represented by counsel. (R. at 528-57.)

By decision dated May 9, 2006,  the ALJ denied Maldonado's claim. (R. at 15-26.)   The ALJ found that Maldonado met the disability insured status requirements of the Act for DIB purposes through the date of his decision. (R. at 18.)  The ALJ found that Maldonado had not engaged in substantial gainful activity at any time relevant to his decision.  (R. at 19.)  The ALJ also found that at all times relevant to the decision, Maldonado suffered  from severe impairments, namely traumatic and degenerative joint disease, obesity and chronic depression and anxiety with post-traumatic stress disorder, ("PTSD"), but that from April 30, 2003, through October 10, 2005, she did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.)

The ALJ found that from April 30, 2003, though October 10, 2005, Maldonado had the residual functional capacity to perform an extremely narrow range of unskilled and low-stress sedentary work,[1] or work generally performed while sitting and which did not require lifting items weighing more than 10 pounds. (R. at 20.) The ALJ found that Maldonado's residual functional capacity from April 30, 2003, through October 10, 2005, also was subject to a sit/stand option, an inability to use the hands or arms for overhead reaching or handling at any level, an occasional ability to crawl and the need to avoid all exposure to hazardous heights or moving machinery. (R. at 20-21.) He further found that Maldonado experienced significant loss of ability to concentrate or recall events and that she would likely miss more than three days of work a month due to medical reasons. (R. at 21.) Thus, the ALJ found that from April 30, 2003, through October 10, 2005, Maldonado was unable to perform her past relevant work as a certified nursing assistant, ("CNA"). (R. at 21.) Based on Maldonado's age during this time period, her education, work history and residual functional capacity, the ALJ found that she could not perform any work. (R. at 22-23.) That being the case, the ALJ concluded that Maldonado was under a disability as defined in the Act from April 30, 2003, through October 10, 2005, and was, therefore, eligible for benefits. (R. at 23.) However, the ALJ further found that improvement in Maldonado's medical condition occurred as of October 11, 2005, thereby ending her disability. (R. at 23.) The ALJ found that, beginning on October 11, 2005, Maldonado had not had an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-24.) The ALJ found that, beginning on October 11, 2005,

---

[1]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2007).

Maldonado had the residual functional capacity to perform a limited range of skilled and low-stress light work.[2] (R. at 24.) The ALJ further found that, beginning October 11, 2005, Maldonado's residual functional capacity was subject to less restrictive physical, environmental and mental limitations than previously. (R. at 24.) Specifically, the ALJ found that Maldonado required a sit/stand option, could walk, stand and/or sit for a total of four hours each in an eight-hour workday, could walk, stand and/or sit without interruption for one hour each, could occasionally use the upper extremities for overhead tasks and should avoid any exposure to hazardous heights and moving machinery. (R. at 24.) The ALJ further found that Maldonado had experienced significant improvement in the ability to concentrate and to recall events due to the reduced severity of her joint and leg pain, once that her degenerative joint disease had partially healed. (R. at 24.) He further found that Maldonado would no longer miss more than three days of work each month due to medical reasons. (R. at 25.) The ALJ found that, as of October 11, 2005, Maldonado was unable to perform her past relevant work as a CNA. (R. at 25.) He further found that, based on her age as of October 11, 2005, her education, work history and residual functional capacity and based on the testimony of a vocational expert, Maldonado could perform jobs existing in significant numbers in the national economy, including those of a clerical worker and a product inspector. (R. at 26.) Thus, the ALJ concluded that Maldonado's disability ended on October 11, 2005, and that she was not eligible for benefits after December 31, 2005.[3] (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2007).

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

[3]According to the Regulations, a claimant's entitlement to disability ends the second month after the month in which the claimant's disability ends. *See* 20 C.F.R. § 404.316(b)(3)

After the ALJ issued his decision, Maldonado pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 6-9.) Maldonado then filed this action seeking review of the ALJ's unfavorable decision, which now stands at the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2007). This case is before the court on Maldonado's motion for summary judgment filed February 11, 2008, and the Commissioner's motion for summary judgment filed February 29, 2008.

## *II. Facts*[4]

Maldonado was born in 1954, which, at the time of the ALJ's decision, classified her as a "person approaching advanced age" under 20 C.F.R. § 404.1563(c). (R. at 67.) Maldonado has a high school education and past relevant work experience as a CNA. (R. at 94, 98.) She testified that she last worked on April 30, 2003, as a CNA at a nursing home. (R. at 531-32.) Maldonado testified that Dr. Grubb, her treating orthopedist, removed her from work as of May 1, 2003, due to back and neck problems with pain radiating across her shoulders and into her arms. (R. at 533-34.) She stated that Dr. Grubb had never released her to return to work. (R. at 533.) She stated that she was in pain all of the time. (R. at 533.) Maldonado testified that driving, lifting and repetitive use of the hands and arms worsened the pain. (R. at 535.) She also stated that she sometimes dropped objects. (R. at 535.) She stated that

---

(2007).

[4]The relevant time period for this court's determination is October 11, 2005, the date the ALJ found that medical improvement occurred in Maldonado's condition so that she no longer was disabled, through May 9, 2006, the date of the ALJ's decision. That being the case, only medical evidence pertinent to this time period is included in this Memorandum Opinion. To the extent that any other medical evidence is included, it is done so for clarity of the record.

-5-

walking and prolonged sitting and standing aggravated her pain.  (R. at 536, 538.)
Maldonado stated that she had bilateral hip and left knee pain that would "come[] and
go[]."  (R. at 536.)  She also stated that she took ibuprofen, analgesics and used heat
application to help alleviate her pain.  (R. at 535.)  Maldonado testified that she
experienced headaches with pain behind both ears and around the back of her head.
(R. at 535.)  She further testified that she had a frozen left shoulder, which had
improved with physical therapy.  (R. at 539-40.)  However, she stated that she
continued to experience pain of the left shoulder and had difficulty reaching overhead.
(R. at 540.)  Maldonado further testified that she suffered from hypertension, for
which she was receiving treatment.  (R. at 548-49.)

Maldonado estimated that she could sit for up to 15 minutes without changing
positions.  (R. at 538.)  She stated that she could stand for up to only three minutes
without changing positions.  (R. at 538.)  Maldonado testified that she slept most
nights in a recliner to alleviate neck pain.  (R. at 538-39.)  However, she stated that
this aggravated her middle back.  (R. at 538.)

Maldonado testified that she had experienced difficulty with her "nerves" off
and on all of her life.  (R. at 540.)  She stated that she witnessed her father drown
when she was young and was sexually abused by a family member.  (R. at 540-41.)
Maldonado testified that she had received treatment for her nerves on and off since
that time.  (R. at 541.)  She stated that her pain had worsened her nerves.  (R. at 541.)
Maldonado testified that she had been diagnosed with depression, and she stated that
she experienced frequent crying spells.  (R. at 541.)  She stated that she had difficulty
with her memory, as well as with focusing and paying attention.  (R. at 542.)  She

-6-

further stated that crowds and noise bothered her. (R. at 542.) Maldonado estimated that she slept approximately four to five hours per night. (R. at 542.) She stated that she had been taking Paxil since approximately 1999. (R. at 546.)

Leah P. Salyers, a vocational expert, also was present and testified at Maldonado's hearing. (R. at 550-57.) Salyers classified Maldonado's past work as a CNA, as generally performed, as heavy[5] to very heavy[6] and semiskilled. (R. at 550-51.) Salyers was asked to consider a hypothetical individual of Maldonado's age, education and work history, who had difficulty reaching overhead and difficulty dealing with people so as to avoid crowds. (R. at 551.) Salyers testified that such an individual could perform the jobs of a clerical worker and a product inspector, both at the light level of exertion, and the jobs of a clerical worker and a machine tender, both at the sedentary level of exertion. (R. at 551-52.) Salyers was next asked to consider an individual who was limited as set forth in psychologist Overstreet's assessment, dated October 20, 2005. (R. at 553-54.) Salyers testified that if the limitations contained therein presented simultaneously, then such an individual could not maintain competitive employment. (R. at 554.) Finally, Salyers testified that an individual with the limitations set forth in Dr. Grubb's October 11, 2005, Physical Capacities Form, would not be able to perform light work. (R. at 556-57.)

---

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting and carrying of items weighing up to 50 pounds. If someone can perform heavy work, she also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2007).

[6]Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can perform very heavy work, she also can perform heavy, medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(e) (2007).

-7-

In rendering his decision, the ALJ reviewed medical records from Blue Ridge Rehabilitation Services; Wythe County Community Hospital; Heartland Rehabilitation Services; Dr. Stephen A. Grubb, M.D.; Wythe Medical Associates, Inc.; Dr. Morgan P. Lorio, M.D.; Eugenie Hamilton, Ph.D., a state agency psychologist; R.J. Milan Jr., Ph.D., a state agency psychologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Belinda G. Overstreet, Ph.D., a licensed clinical psychologist; Nora King, L.C.S.W., a licensed clinical social worker; and Dr. William M. Tomiak, M.D. Maldonado's attorney also submitted additional medical reports from Dr. Grubb, Dr. Tomiak and King to the Appeals Council.[7]

On September 19, 2005, Maldonado saw Nora King, a licensed clinical social worker at Mount Rogers Community Services Board, for a mental health assessment. (R. at 450-57.) Maldonado referred herself for treatment of symptoms of depression and anxiety. (R. at 450, 456.) She exhibited psychomotor restlessness, and her affect/mood was described as sad/dysthymic, irritable, anxious/nervous/worried and angry/hostile. (R. at 451.) King noted no psychosis. (R. at 451.) It was noted that Maldonado was sexually abused by a family member as a child and that she attempted suicide by overdose in 1984. (R. at 452.) King noted that Maldonado was mildly limited in her ability to access resources and moderately limited in her ability to manage money and to shop. (R. at 453.) King diagnosed major depressive disorder, recurrent, severe, with no psychosis, and a then-current Global Assessment of

---

[7]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Functioning, ("GAF"), score of 40.[8]  (R. at 456.)

On October 4, 2005, Maldonado saw Belinda G. Overstreet, Ph.D., a licensed clinical psychologist, for a psychological evaluation at the request of her attorney.  (R. at 437-44.)  Overstreet noted that Maldonado was fully oriented with intact attention and concentration, but she interrupted lengthy instructions.  (R. at 438.)  Her short-term memory was intact, but long-term memory was mildly impaired.  (R. at 438.)  She was able to successfully perform a three-stage command.  (R. at 438.)  Her mood was described as depressed and irritable, with a congruent affect.  (R. at 438.)  Maldonado's insight was adequate, but her judgment regarding basic decisions was deemed "questionable."  (R. at 439.)  Nonetheless, she was deemed competent to manage her own funds.  (R. at 439.)

Maldonado described depression beginning in 1984, but worsening since 2003 due to chronic pain.  (R. at 439.)  She reported one suicide attempt by overdose in 1984, but denied then-current suicidal ideations.  (R. at 439.)  In addition to her history of sexual abuse, Maldonado also stated that she witnessed her father drown when she was a child, and she stated that she had two verbally and physically abusive ex-husbands.  (R. at 439.)  She stated that she had received no psychiatric treatment, but reported that she was then-currently seeing a mental health counselor.  (R. at 440.)  Overstreet administered the Personality Assessment Inventory, ("PAI"), the results of

---

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical range of mental health–illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..."  DSM-IV at 32.

which were deemed valid. (R. at 441.) The PAI revealed that Maldonado likely was suffering from major depressive symptoms, including transient suicidal ideation. (R. at 442.) The Pain Patient Profile, ("P-3"), also was administered, which revealed that Maldonado's depressive symptoms were higher than the average of pain patients. (R. at 443.) Overstreet diagnosed major depressive disorder, moderate to severe, recurrent, without psychotic features, generalized anxiety disorder overlaid by features of PTSD and a then-current GAF score of 53.[9] (R. at 443.) She opined that Maldonado's symptoms would moderately impair her functioning, but that with consistent treatment, she deemed her prognosis as fair. (R. at 443.)

Overstreet opined that Maldonado could understand and carry out simple, as well as detailed/complex, instructions, but might experience mild difficulty recalling detailed/complex instructions. (R. at 444.) She deemed her intelligence to be in the average range. (R. at 444.) Overstreet found that Maldonado was able to understand work rules and to make basic work decisions. (R. at 444.) She opined that Maldonado was likely able to largely interact appropriately with supervisors and co-workers, but her ability to work with the public was likely to be dependent on the number of people and the size of the setting. (R. at 444.) Overstreet opined that Maldonado's depressive symptoms might result in increased rates of absenteeism and tardiness. (R. at 444.) However, she found that, in and of itself, the stressors of the typical work setting were unlikely to result in a further deterioration in functioning. (R. at 444.)

---

[9]A GAF score of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32.

On October 11, 2005, Dr. Stephen Grubb, M.D., an orthopedic specialist, completed a Physical Capacities Form, indicating that Maldonado could return to modified permanent work duty. (R. at 445.) Specifically, Dr. Grubb found that Maldonado could lift items weighing up to 10 pounds from floor to waist level, but could not repetitively lift items weighing more than five pounds from floor to waist level. (R. at 445.) He found that she could lift items weighing up to 20 pounds at a time from waist to chest level, but could not repetitively lift items weighing more than 10 pounds from waist to chest level. (R. at 445.) Dr. Grubb opined that Maldonado could carry items weighing up to 20 pounds, but could not repetitively carry items weighing more than 10 pounds. (R. at 445.) He found that she could push/pull items weighing up to 20 pounds, but could not repetitively push/pull items weighing more than 10 pounds. (R. at 445.) Dr. Grubb found that Maldonado could lift items overhead weighing up to five pounds, but could not lift any weight overhead repetitively. (R. at 445.) Dr. Grubb further found that Maldonado could grasp, bend, twist, climb, kneel and squat. (R. at 445.) He found that she could stand for one hour without interruption and for a total of four hours in an eight-hour workday. (R. at 445.) He found that she could walk for one hour without interruption and for a total of four hours in an eight-hour workday. (R. at 445.) Dr. Grubb further found that Maldonado could sit for one hour without interruption and for a total of four hours in an eight-hour workday. (R. at 445.)

Overstreet completed a mental assessment on October 20, 2005, finding that Maldonado had an unlimited or very good ability to follow work rules and to understand, remember and carry out simple job instructions. (R. at 446-47.) She found that Maldonado had a good ability to relate to co-workers, to interact with

-11-

supervisors, to maintain attention/concentration, to understand, remember and carry out both detailed and complex job instructions, to maintain personal appearance and to relate predictably in social situations. (R. at 446-47.) Overstreet opined that Maldonado had a fair ability to deal with the public, to use judgment, to deal with work stresses, to function independently, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 446-47.)

Maldonado saw Dr. William M. Tomiak, M.D., on October 28, 2005, to initiate care with him as her new primary care physician. (R. at 460-61.) She complained of hypertension and depression. (R. at 460.) Maldonado was alert and in no acute distress. (R. at 461.) A musculoskeletal examination showed no localized tenderness or swelling and a full range of motion. (R. at 461.) Dr. Tomiak diagnosed benign essential hypertension and depression, and he prescribed Paxil and Mavik. (R. at 460.)

Maldonado again saw King on November 22, 2005, for individual therapy. (R. at 459.) She exhibited crying episodes and focused on her history of abuse, noting that this continued to contribute to her then-current symptoms. (R. at 459.) King found Maldonado's affect labile, and she noted no change in her condition/progress. (R. at 459.) Maldonado again saw Dr. Tomiak on November 30, 2005, at which time she was alert and in no acute distress. (R. at 466-67.) A musculoskeletal examination revealed no localized tenderness or swelling, and she had a full range of motion. (R. at 467.) Maldonado noted that she felt a little better since starting Paxil. (R. at 466.) Dr. Tomiak diagnosed benign essential hypertension and improved depression and increased her dosage of Paxil. (R. at 466.)

On December 6, 2005, Dr. Grubb noted that Maldonado's symptoms remained unchanged from the previous visit. (R. at 448.) However, she did report that the left "frozen" shoulder had resolved with therapy. (R. at 448.) Maldonado complained of burning pain behind both ears and across the back of her head with neck pain that radiated across the shoulder and into the upper back. (R. at 448.) However, her previously-reported arm pain had diminished. (R. at 448.) Maldonado also complained of low back pain and left knee pain. (R. at 448.) She noted that her back pain was aggravated by walking, standing and sitting in a straight-back chair, and she stated that her neck pain was worse with walking. (R. at 448.) Maldonado reported that lying down helped to alleviate her back pain, while lying down and taking hot showers helped her neck pain. (R. at 448.) A physical examination revealed a normal gait, including normal heel walk and toe walk. (R. at 449.) Maldonado was able to flex her head forward touching her chin to within three fingerbreadths from the chest. (R. at 449.) Extension was neutral, and rotation to the right was 26 to 45 degrees, limited by pain. (R. at 449.) Maldonado exhibited tenderness over the right and left pectoralis major and right rhomboid. (R. at 449.) She exhibited normal strength in the upper extremities. (R. at 449.) Cervical x-rays revealed disc space narrowing at the C5-6 level of the spine, spondylolisthesis of the C4 on C5, evidence of foraminal narrowing on the right at the C3-4 level of the spine and evidence of foraminal narrowing on the left at the C4-5 level of the spine. (R. at 449.) Dr. Grubb diagnosed cervical degenerative disc disease and discogenic cervical pain. (R. at 449.)

On January 6, 2006, Maldonado again saw King for individual therapy. (R. at 458.) Maldonado exhibited psychomotor restlessness and an elevated and anxious mood. (R. at 458.) King again noted no change in Maldonado's treatment/progress.

-13-

(R. at 458.)  On February 7, 2006, Maldonado's affect/mood and thought processes were unremarkable.  (R. at 486.)  King noted no change in Maldonado's treatment/progress.  (R. at 486.)  On March 8, 2006, King noted psychomotor retardation and a flat affect, and she opined that Maldonado had made some minimal progress.  (R. at 487.)

Maldonado saw Dr. Tomiak on May 18, 2006, with complaints of worsening body aches over the previous two days.  (R. at 475-76.)  Maldonado further stated that an increased dosage of Paxil helped her.  (R. at 475.)  Although Maldonado exhibited tenderness over most of her back, bilateral upper extremities and bilateral lower extremities, she exhibited no obvious trigger points on examination.  (R. at 476.)  A neurological examination was grossly intact.  (R. at 476.)  Dr. Tomiak diagnosed myalgia and depression.  (R. at 475.)  He administered a Toradol injection for Maldonado's pain, and he prescribed Cymbalta in place of Paxil due to its neuropathic qualities, which he opined might help with her migrating pain, as well as address her depression more fully.  (R. at 475.)  Maldonado was referred to a physical medicine and rehabilitation doctor for evaluation and treatment of her pain syndrome.  (R. at 475.)  On June 6, 2006, Maldonado saw Dr. Grubb for a follow up.  (R. at 493-94.)  She continued to complain of multiple body aches and pains.  (R. at 493.)  Maldonado's gait was normal.  (R. at 494.)  She could flex forward touching her fingertips to within nine to 12 inches from the floor, and she could extend 11 to 20 degrees.  (R. at 494.)  She was able to bend laterally to the right and left touching her fingertips to within two to four inches from her knees.  (R. at 494.)  Maldonado's strength in her lower extremities was within normal limits.  (R. at 494.)  Dr. Grubb diagnosed cervical degenerative disc disease, discogenic cervical pain, lumbar

-14-

degenerative disc disease and discogenic lumbar pain, and he ordered a cervical MRI. (R. at 494.)

Maldonado again saw King on June 7, 2006, at which time King noted no change in her treatment/progress. (R. at 488.) She again saw Dr. Tomiak on June 13, 2006, reporting improved depression with Cymbalta. (R. at 479-80.) She had a depressed affect, but no thought or memory difficulty and no suicidal or homicidal ideation. (R. at 480.) She was diagnosed with benign essential hypertension and depression. (R. at 479.) Dr. Tomiak increased Maldonado's dosage of Cymbalta. (R. at 479.) On June 14, 2006, Maldonado underwent an MRI of the cervical spine, which showed degenerative changes of the lower cervical spine, a combination of osteophyte and focal disc protrusion at the C5-6 level of the spine without significant impression upon the cord, a combination of disc bulging, as well as posterior osteophytes, resulting in some moderate effacement of cerebrospinal fluid anterior to the cord at the C5-6 and C6-7 levels and some mild degenerative changes at the T2-3 level with a combination of posterior osteophytes and disc bulging also resulting in some mild effacement of cerebrospinal fluid anterior to the cord without any degree of spinal stenosis at that level. (R. at 484-85.)

On June 27, 2006, Dr. Grubb noted that Maldonado's symptoms remained unchanged from her last visit. (R. at 490-92.) A physical examination revealed a normal gait and normal heel walk and toe walk. (R. at 491.) Maldonado's flexion, extension and lateral bending were unchanged from her previous visit. (R. at 491.) She exhibited tenderness over the midline at the T7-8 and T8-9 levels of the spine. (R. at 491.) Maldonado's strength in both the upper and lower extremities was

normal.  (R. at 491.)  Dr. Grubb diagnosed cervical degenerative disc disease, discogenic cervical pain, discogenic thoracic pain, lumbar degenerative disc disease and discogenic lumbar pain.  (R. at 491-92.)  He scheduled further diagnostic testing in order to better define the cause of Maldonado's pain.  (R. at 492.)

On July 6, 2006, Maldonado reported improvement with an increased dosage of Cymbalta, stating that her depression was "much better" and that her generalized pains were not as intense.  (R. at 482.)  Dr. Tomiak indicated no signs of mood, thought or memory difficulty.  (R. at 483.)  He diagnosed improved depression and improved myalgia.  (R. at 482.)  The following day, King deemed Maldonado's behavior unremarkable, and she noted a "brighter" affect.  (R. at 489.)  On July 12, 2006, Maldonado again saw Dr. Grubb.  (R. at 501-03.)  She reported anxiety, nervousness and depression, neck stiffness and pain, muscle tenderness, headaches and memory loss.  (R. at 502.)  A physical examination revealed a limited range of motion of the neck, but normal strength in both the upper and lower extremities.  (R. at 502-03.)  She was alert and fully oriented, her cranial nerves were grossly intact, motor strength was full in all extremities, deep tendon reflexes were normal and coordination was normal.  (R. at 503.)  Dr. Grubb again diagnosed cervical degenerative disc disease, discogenic cervical pain, discogenic thoracic pain, lumbar degenerative disc disease and discogenic lumbar pain.  (R. at 503.)

Dr. Grubb performed a cervical discogram on July 28, 2006, noting that the C5-6 level of Maldonado's spine was degenerative and concordantly painful.  (R. at 504.)  He further noted that the C3-4 level of the spine was painful on the first injection only.  (R. at 504.)  On August 16, 2006, Maldonado continued to complain of neck pain and

-16-

upper back pain. (R. at 506.) Her gait was normal, and her back range of motion was unchanged from her previous visit, as was her neck exam. (R. at 507.) Lumbar x-rays revealed disc space narrowing at the L1-2, L4-5 and L5-S1 levels of the spine, as well as a retrolisthesis at the L4-S1 level of the spine. (R. at 507-08.) Dr. Grubb stated that the myelogram and post myelogram CT scan revealed several small disc bulges in the thoracolumbar spine, but no evidence of cord or root compression. (R. at 508.) There was a minor C4-5 spondylolisthesis, as well as posterior vertebral body end-plate spurs in the cervical spine. (R. at 508.) The cervical discography revealed the C3-4 level to have a posterior tear. (R. at 508.) The C5-6 level of the spine was degenerated and concordantly painful. (R. at 508.) An EKG from July 17, 2006, showed sinus bradycardia, and a chest x-ray showed no active disease. (R. at 508, 517.) Dr. Grubb diagnosed cervical degenerative disc disease, discogenic cervical pain, lumbar degenerative disc disease and sacroiliitis versus spondylitic arthropathy. (R. at 508.) He referred Maldonado to a rheumatologist. (R. at 508.) A CT scan of the cervical spine following the cervical discogram, taken on July 28, 2006, showed degenerative cervical disc disease at multiple levels and facet arthritis with a fused left C4-5 facet joint with foraminal narrowing. (R. at 518-21.)

On September 14, 2006, Maldonado saw Dr. Robert R. Johnson, M.D., a rheumatologist, for an evaluation of her condition. (R. at 513-16.) A physical examination revealed tenderness across the chest wall at the sternoclavicular and prectoral insertions. (R. at 516.) She also exhibited minimal tenderness at the base of the skull with moderate tenderness at the base of the neck and trapezius muscles. (R. at 516.) Maldonado had severe tender points in the medial scapular border, and Dr. Johnson noted that she held her left shoulder higher than the right. (R. at 516.)

-17-

She had tight lumbar paraspinous muscles with minimal trigger point, mild trigger point presacral, moderate trigger point gluteal and severe trigger point trochanteric. (R. at 516.) Maldonado had normal flexion and extension of the lumbar spine. (R. at 516.) Lateral bending and rotation was painful, but nearly full, and she had full motor strength, normal motion of the distal interphalangeal and proximal interphalangeal joints, normal motion of the wrist, full, but painful, arc of motion of the shoulder, tender trochanters, tender anserine bursa and medial fat pad of the knee, but no patellar grind, effusion or warmth. (R. at 516.) Maldonado relayed difficulty with balance. (R. at 515.) Dr. Johnson indicated that there was no evidence on history, physical or imaging to suggest inflammatory disease of the spine of an ankylosing spondylitis or seronegative spondyloarthropathy type. (R. at 513.) He opined that Maldonado's back pain and neck pain were mechanical and degenerative with significant diffuse cervical spondylosis seen on imaging. (R. at 513.) Dr. Johnson noted that Maldonado had a large amount of myofascial pain with multiple paired trigger points on exam meeting the criteria for lable fibromyalgia. (R. at 513.) He continued Maldonado on Cymbalta and added a trial of Flexeril. (R. at 513.) Dr. Johnson emphasized the importance of regular exercise in controlling fibromyalgia symptoms, and he opined that rheumatology had little to add to the care of cervical and lumbar spondylosis, concluding that he would not become involved in the management of Maldonado's chronic pain. (R. at 513.)

On September 15, 2006, Maldonado stated that an increased dosage of Cymbalta, which Dr. Tomiak had given to her as samples, had "really helped" her depression as well as her myalgias. (R. at 522.) She reported burning in the hands and feet, which she associated with her back problems, but she denied any weakness.

(R. at 522.) Maldonado exhibited full range of motion and no edema or tenderness of the extremities. (R. at 523.) A musculoskeletal examination revealed a full range of motion and no localized tenderness or swelling. (R. at 523.) A neurological examination revealed intact sensation to light touch, but Maldonado reported diminished sensation in the hands and feet bilaterally. (R. at 523.) Dr. Tomiak noted that Maldonado was alert and fully oriented, and she exhibited no signs of mood, thought or memory difficulty. (R. at 523.) He diagnosed myalgia, depression and neuralgia/neuritis, not otherwise specified. (R. at 522.) Her dosage of Cymbalta was increased, pending approval by Maldonado's insurance company, primarily to help with her myalgias and neuropathic pains. (R. at 522.) Maldonado again saw Dr. Tomiak on October 23, 2006, reporting increased headaches and more pain after taking a decreased dosage of Cymbalta.[10] (R. at 525.) She reported improvement in her depressive symptoms with the medication, but noted that she could tell a difference with the decreased dosage. (R. at 525.) On physical examination, Maldonado was alert and in no acute distress. (R. at 526.) Maldonado's musculoskeletal examination was unchanged from her previous visit. (R. at 526.) She exhibited no signs of mood, thought or memory difficulty. (R. at 526.) Dr. Tomiak diagnosed neuralgia/neuritis, not otherwise specified, and depression, and he prescribed Lyrica. (R. at 525.)

On November 16, 2006, Dr. Grubb noted that Maldonado's symptoms had improved since her last visit, which Maldonado attributed to medication. (R. at 509.) She continued to complain of multiple body aches and pains. (R. at 509.) A physical

---

[10]Apparently, Maldonado's insurance company disapproved the increased dosage of Cymbalta.

Case 1:07-cv-00070-PMS   Document 13   Filed 04/15/08   Page 19 of 27   Pageid#: 607

examination revealed that Maldonado's gait was normal. (R. at 510.) She was able to flex forward touching her fingertips to within three to six inches from the floor, improved from the nine to 12 inches on June 27, 2006. (R. at 510.) Extension was 21 to 30 degrees, improved from 11 to 20 degrees, and she was able to bend laterally to the right and left touching her fingertips to within two to four inches from the knees. (R. at 510.) Maldonado had normal strength in both the upper and lower extremities bilaterally. (R. at 510.) She could flex her head forward touching her chin to within two fingerbreadths from the chest, improved from the three fingerbreadths on June 27, 2006. (R. at 510.) However, extension of the neck was decreased to five to 10 degrees, and rotation on both the right and left was decreased to 26 to 45 degrees. (R. at 510.) Rotation was limited by stiffness. (R. at 510.) Dr. Grubb diagnosed Maldonado with cervical degenerative disc disease, discogenic cervical pain, lumbar degenerative disc disease and sacroiliitis versus spondylitis arthropathy. (R. at 511.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review

does not proceed to the next step.  *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall v. Harris*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 9, 2006, the ALJ denied Maldonado's claim. (R. at 15-26.)  The ALJ found that at all times relevant to the decision, Maldonado suffered from severe impairments, namely traumatic and degenerative joint disease, obesity and chronic depression and anxiety with PTSD, but that from April 30, 2003, through October 10, 2005, she did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.)  The ALJ concluded that Maldonado was under a disability as defined in the Act from April 30, 2003, through October 10, 2005, and was, therefore, eligible for benefits.  (R. at 23.) However, the ALJ further found that improvement in Maldonado's medical condition occurred as of October 11, 2005, thereby ending her disability.  (R. at 23.)  The ALJ found that, beginning on October 11, 2005, Maldonado had not had an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (R. at 23-24.)  The ALJ found that, beginning on October 11, 2005, Maldonado had the residual functional capacity to perform a limited range of skilled and low-stress light work.  (R. at 24.)  The ALJ further found that, beginning October 11, 2005, Maldonado's residual functional capacity was subject to less restrictive physical, environmental and mental limitations than previously.  (R. at 24.)  Specifically, the ALJ found that Maldonado required a sit/stand option, could walk, stand and/or sit for a total of four hours each in an eight-hour workday, could walk, stand and/or sit without interruption for one hour each, could occasionally use the upper extremities for overhead tasks and should avoid any exposure to hazardous heights and moving machinery.  (R. at 24.)  The ALJ further found that Maldonado had experienced significant improvement in the ability to concentrate and to recall recent events due to the reduced severity of her joint and leg pain, once that her degenerative joint disease had partially healed.  (R. at 24.)  He further found that Maldonado would no longer miss more than three days of work each month due to medical reasons.  (R. at 25.)  Thus, the ALJ found that, as of October 11, 2005, Maldonado was unable to perform her past relevant work as a CNA.  (R. at 25.)  He further found that, based on her age as of October 11, 2005, her education, work history and residual functional capacity and based on the testimony of a vocational expert, Maldonado could perform jobs existing in significant numbers in the national economy, including those of a clerical worker and a product inspector.  (R. at 26.)  Thus, the ALJ concluded that Maldonado's disability ended on October 11, 2005, and that she was not eligible for benefits after December 31, 2005.  (R. at 26.)  *See* 20 C.F.R. § 404.1520(g) (2007).

As stated above, the court's function in the case is limited to determining

Case 1:07-cv-00070-PMS   Document 13   Filed 04/15/08   Page 22 of 27   Pageid#: 610

whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Maldonado argues that the ALJ erred by finding that she was not disabled as of October 11, 2005. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief") at 9-11.) Maldonado also argues that the ALJ erred by failing to give more weight to the opinions of her treating physicians than to nontreating physicians. (Plaintiff's Brief at 11.) Finally, Maldonado argues that the ALJ erred by failing to consider all of her impairments in combination. (Plaintiff's Brief at 12.)

-23-

Maldonado argues that the ALJ erred by finding that she no longer was disabled as of October 11, 2005. For the following reasons, I will remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

It is clear from the ALJ's decision that he accepted the findings contained in Dr. Grubb's October 11, 2005, Physical Capacities Form, as that is the date on which he concluded that Maldonado no longer was disabled. In this assessment, Dr. Grubb found that Maldonado could lift items weighing up to 10 pounds from floor to waist level, but could not repetitively lift items weighing more than five pounds from floor to waist level. (R. at 445.) He found that she could lift items weighing up to 20 pounds at a time from waist to chest level, but could not repetitively lift items weighing more than 10 pounds from waist to chest level. (R. at 445.) Dr. Grubb opined that Maldonado could carry items weighing up to 20 pounds, but could not repetitively carry items weighing more than 10 pounds. (R. at 445.) He found that she could push/pull items weighing up to 20 pounds, but could not repetitively push/pull items weighing more than 10 pounds. (R. at 445.) Dr. Grubb found that Maldonado could lift items overhead weighing up to five pounds, but could not lift any weight overhead repetitively. (R. at 445.) Dr. Grubb further found that Maldonado could grasp, bend, twist, climb, kneel and squat. (R. at 445.) He found that she could stand for one hour without interruption and for a total of four hours in an eight-hour workday. (R. at 445.) Likewise, he found that she could walk for one hour without interruption and for a total of four hours in an eight-hour workday. (R. at 445.) He further found that she could sit for one hour without interruption and for

-24-

a total of four hours in an eight-hour workday. (R. at 445.)

The vocational expert testified that the restrictions imposed on Maldonado by Dr. Grubb in the October 11, 2005, assessment, would, under the Dictionary of Occupational Titles, eradicate the jobs enumerated at the light level of work, and would perhaps even suggest that the individual would be able to perform less than the full range of sedentary work. (R. at 556-57.) Given this testimony by the vocational expert, I find that it is questionable that a significant number of jobs would remain in the national economy that Maldonado could perform. However, it is not entirely possible to make that finding based on the record before the court because the vocational expert testified only that the number of sedentary jobs would be eroded, but not completely eradicated, without specifying what she meant in terms of the number of jobs that would remain. Aside from this issue, I further note that, with the exception of clearly accepting the October 11, 2005, findings of Dr. Grubb, the ALJ, contrary to applicable Fourth Circuit case law, did not explicitly state the weight he was giving to obviously probative evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979) (holding that "the [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight.") "The courts ... face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. &*

*Welfare*, 567 F.2d 396, 397 (4th Cir. 1974)). For these reasons, I find that the court cannot determine whether substantial evidence supports the ALJ's finding that Maldonado no longer suffered from a disabling physical impairment as of October 11, 2005. That being said, I will remand the case to the Commissioner on this ground for further consideration consistent with this Memorandum Opinion.

I further find that the court cannot determine from the record before it whether the ALJ's finding that Maldonado no longer suffered from a disabling mental impairment as of October 11, 2005, is supported by substantial evidence. Psychologist Overstreet, in a mental assessment dated October 20, 2005, just slightly longer than a week after the date on which the ALJ found that Maldonado no longer was disabled, found that Maldonado had a fair ability to deal with the public, to use judgment, to deal with work stresses, to function independently, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 446-47.) The vocational expert explicitly testified that such an individual would not be able to sustain employment if these limitations presented simultaneously on an ongoing basis. (R. at 555.) I note that the ALJ indicated that he based his decision on the vocational expert's testimony. (R. at 26.) I further note, however, that, the ALJ did not explicitly state whether he was accepting or rejecting Overstreet's opinions. In fact, just as with the opinions pertaining to Maldonado's physical impairments, the ALJ did not state what weight he was giving to any opinion contained in the record regarding the severity of Maldonado's mental impairment. That being said, I also will remand the case to the Commissioner on this ground for further consideration consistent with this Memorandum Opinion.

*IV. Conclusion*

For the foregoing reasons, Maldonado's and the Commissioner's motions for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and this case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion. I further deny Maldonado's request to present oral argument based on my finding that it is not necessary in that the parties have more than adequately addressed the relevant issues in their written arguments.

An appropriate order will be entered.

DATED:     This 14th day of April 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE